**HOSPITAL MANAGEMENT ASSOCIATES, INC. and Coffee Hospital Management Associates, Inc., Plaintiffs-Appellees,**

v.

**COFFEE COUNTY, Tennessee and Don J. Darden, County Executive of Coffee County, Tennessee, Defendants-Appellants.**

Supreme Court of Tennessee,
at Nashville.

April 8, 1985.

John W. Rollins, Manchester, G. Nelson Forrester, Doyle E. Richardson, Mary F. Bristow, Forrester & Richardson, Tullahoma, for defendants-appellants.

Edward C. Blank, III, Nashville, for plaintiffs-appellees.

## OPINION

HARBISON, Justice.

Although other issues were extensively litigated in the trial court and Court of Appeals, the only questions presented for review in this Court concern the right of Coffee County, Tennessee and its County Executive to cancel a hospital development agreement between the County and appellees executed on April 30, 1981. Both the trial court and the Court of Appeals held that this was a separate and independent agreement for the financing and construction of a new hospital facility and that appellants had not established either factually or legally any basis for its termination. We affirm that decision.

Insofar as there are any factual issues underlying the questions presented, there is a concurrent finding of fact by the trial court and Court of Appeals supported by material evidence, thereby foreclosing any review here of factual disputes. *See* T.C.A. § 27–1–113. Both courts have found that appellees diligently pursued their obligations under the development agreement insofar as the acquisition of a Certificate of Need from hospital regulatory authorities was concerned,[1] and they secured from the Industrial Board of Coffee County, Tennessee the necessary "inducement contract" under which the Board agreed to issue revenue bonds to finance the construction of the hospital facility. This instrument was executed by the Board and by appellees in January and February 1982. The Certificate of Need was issued on April 6, 1982, having been approved on March 24. The Certificate provided for a timetable for the development of the project, including the submission of final plans nine months after the date of approval, securing of financing within fifteen months thereafter and commencement of construction within eighteen months.

There is no evidence in the record of failure by appellees to carry out their obligations under the development agreement. They were to obtain a suitable site for the project, and this they did by September 1981. They examined several commercial tracts of land, and ultimately elected to

---

1. *See* T.C.A. § 68–11–106. The Certificate was obtained by appellees after public hearings and administrative proceedings in which county officials supported and assisted the application by appellees.

build the new building on a tract of some fourteen acres owned by Coffee County itself. On September 24, 1981 the County granted an option to appellees to purchase the site for $168,000 or to lease it at a fixed annual rental for a term coinciding with the term of the Industrial Revenue Bonds as provided for in the development agreement of April 30, 1981. This option was extended until September 23, 1982. The option to lease was exercised prior to that date. No lease has actually been executed because of this litigation, nor, insofar as the record discloses, have further steps been taken to implement the development agreement, because the County instituted an action to cancel both it and the real estate option by counterclaim filed in August 1982. Factually, however, there is a concurrent finding by the courts below that there has been no breach of the development agreement by appellees, nor was any such claim seriously asserted during the lengthy evidentiary hearings held in the trial court.

Essentially, appellants contend that they were entitled to cancel the development agreement and the subsequent option because these were a part of, or incidental to, an overall contractual plan between the County and appellees, under which appellees were to assume the operation of an existing county hospital until such time as a new facility could be authorized and constructed. Simultaneously with the execution of the development agreement on April 30, 1981, the County and appellees also executed a lease agreement, under which the County leased an existing hospital facility, previously operated by it, to appellees for a term of three years "or until the completion of a new replacement hospital facility, whichever first occurs." Since the new facility was not completed within the three-year period, the lease would have expired by its terms at the end of April 1984 unless the parties agreed otherwise by further negotiation or unless it was cancelled prior to the fixed expiration date.[2]

It has been the insistence of the appellants throughout the proceedings, however, that the lease and the development agreement constituted one contractual arrangement, so that cancellation or termination of the one automatically, as a matter of law, entitled appellants to terminate the other. The courts below held to the contrary, and we are of the opinion, after careful review of the extensive record in this case, that their decision was correct.

The lease agreement is a detailed document, dealing primarily with the assumption by appellees of the operation of an existing hospital facility which had been operated by the County for several years at a considerable financial loss. The agreement provided for $25,000 per month rent to be paid to the County. Insofar as the record reveals, that rent was paid from inception through the period involved in the litigation, and presumably until the lease expired in April 1984. Appellants sought to cancel the lease in April 1982, less than one year after it was executed, because of a default by appellees in making payments on a pharmacy contract, previously let by the County and assumed by appellees in the lease. The right of appellants to cancel was the subject of an original action commenced by appellees in July 1982. The trial court ultimately held that appellants had properly exercised their right of cancellation, and the Court of Appeals affirmed. This Court denied an application by appellees to review that issue. Appellees continued to operate the hospital, however, during the pendency of the appeal which has continued beyond the original expiration date. Upon remand it will be necessary for the trial court to take an accounting between the parties if there are any further financial obligations of either to the other as the result of the cancellation of the lease or of the continued operation of the facility by appellees.

As previously stated, the lease itself would have expired at the end of April 1984

2. The lease contained no renewal right by the lessee. In the event of holding over, the tenan- cy was to be month-to-month only.

in all events. Nothing in it suggests that the development agreement would also have expired at that time. In their brief in this Court appellants concede that they would have had no right to cancel the separate development agreement "if bonds had been issued and construction commenced on the new hospital...." Because those steps had not yet been taken, however, appellants seem to insist that they had a right to cancel the development contract at the stage which it had reached in April 1982, when the lease was cancelled.

This does not follow. Either the two agreements were one and inseparable throughout, or they were separate from the beginning. Nothing in them indicates that at some point in its performance the development agreement would have reached a state that rendered cancellation improper, whereas it could have been cancelled prior to that point. The development agreement contains no provisions for cancellation.[3] Since there has been no breach of its terms either alleged or proved, the only arguable basis for its cancellation by appellants is that it was an integral part of the lease agreement.

The courts below found that it was not, and we agree with that conclusion. The two agreements are separate in form. The terms of the lease provide almost in their entirety for the assumption and operation of the existing hospital. Article 23 gives the lessor, appellants here, the right to terminate after thirty days' notice of breach by the lessee. This occurred. The lessee fell behind in the payments of a pharmacy contract, previously let by the County and assumed by the lessee. Various reasons were given for this, including a claim that the pharmacy contract was unconscionable and inordinately profitable to the pharmacy company holding it. Appellees attempted to renegotiate it and withheld monthly payments accruing under it in an attempt to gain leverage to force such renegotiation. County officials became concerned after being notified of the situation by the pharmacy company, because the County had not been released from liability.

Despite the fact that appellees offered indemnification and assurances to the County, they did not settle the debt owed to the pharmacy company within thirty days after being notified to do so by the County. Accordingly the County cancelled the lease, and it has been established in this litigation that the County was legally entitled to do so. Appellees insist that the action of the County was not equitable, since there was no question of the ability of appellees to make the payment. In fact they did make a very substantial payment, in excess of $200,000, within a few days after the County had elected to terminate the lease. Most of the litigation in the trial court involved questions as to whether the County had agreed to further negotiations and as to whether there was anything more than a technical breach by the lessee. These questions have been resolved, however, and the County has made its election to cancel the lease.

The only reference in the lengthy lease agreement to the separate development contract for a new hospital facility is contained in Article 9. That article provides as follows:

"ARTICLE 9. DEVELOPMENT OF REPLACEMENT HOSPITAL FACILITY AND RENOVATION OF LEASED PREMISES.

"Simultaneously with the execution of this Lease, the parties shall execute a Development Contract for the construction and subsequent operation of a replacement hospital facility. It is the intent of the Lessee to finance construction of the replacement hospital facility with Industrial Revenue Bonds. At the expiration of the time period for the maturity

---

**3.** It does contain contengencies, relieving the developer of further responsibility if the Certificate of Need or the Industrial Revenue Bonds could not be authorized and issued. Presumably had this occurred prior to April 1984 the development contract would have terminated, but the lease on the existing hospital would have continued until expiration unless the parties agreed otherwise after further negotiation.

of the Industrial Revenue Bonds Lessee will return the building to Lessor and negotiate with Lessor for the continued operation of the facility.

"Lessee, upon completion of the hospital replacement facility, shall provide for the renovation of the Leased Premises into a 100–120 bed nursing home facility and its subsequent operation by Lessee or a qualified sub-lease approved by Lessor, which approval shall not be unreasonable [sic] withheld."

The article continues with provisions for the annual rental of the renovated leased premises after such renovations has been completed and then continues:

"The period of the Lease for the 100–120 bed nursing home facility shall be the same as the Lease period for the replacement hospital facility.

"After completion of the new hospital, Lessee will buy all of Lessor's hospital equipment that Lessee needs from the Lessor at the Lessor's Book Value."

It is apparent both from this article and from the development agreement itself that the construction of the new replacement hospital was to be financed by Industrial Revenue Bonds. The issuance and the provisions of such bonds are governed by the terms of T.C.A. Title 7, Chapter 53. Ordinarily facilities constructed pursuant to these statutes are situated on premises owned by or leased to a county industrial board or commission and then leased to a project developer under terms by which rental payments are sufficient to retire the bonds.

T.C.A. § 7–53–304 expressly provides for terms of such bonds and contains provisions governing default. The statute provides:

"The principal of and interest on any bonds issued by the corporation shall be secured by a pledge of the revenues and receipts out of which the same shall be payable, and may be secured by a mortgage or deed of trust covering all or any part of the projects from which the revenues or receipts so pledged may be derived, including any enlargements of and additions to such projects thereafter made, and/or by an assignment and pledge of all or any part of the corporation's interest in and rights under the leases, sale contracts or loan agreements relating to such projects, or any thereof. The resolution under which the bonds were authorized to be issued and any such mortgage or deed of trust may contain any agreements and provisions respecting the maintenance of the projects covered thereby, the fixing and collection of rents or payments with respect to any projects or portions thereof covered by such resolution, mortgage or deed of trust, the creation and maintenance of special funds from such revenues and from the proceeds of such bonds, *and the rights and remedies available in the event of default*, all as the Board of Directors shall deem advisable not in conflict with the provisions hereof. Each pledge, agreement, mortgage and deed of trust made for the benefit or security of any of the bonds of the corporation shall continue effective until the principal of and interest on the bonds for the benefit of which the same were made shall have been fully paid. In the event of default in such payment or in any agreements of the corporation made as a part of the contract under which the bonds were issued, whether contained in the proceedings authorizing the bonds or in any mortgage and deed of trust executed as security therefor, such payment or agreement may be enforced by suit, mandamus, the appointment of a receiver in equity, or by foreclosure of any such mortgage and deed of trust, or any one or more of said remedies." (Emphasis added.)

It is obvious that the ultimate terms of the bonds issued to implement the development contract and the terms upon which the project developer could be treated in default had to be agreed upon between appellees and the Coffee County Industrial Board. Those terms were not part of or even subject to the lease agreement governing the existing hospital. Insofar as

the present record shows, those terms have not yet been agreed upon. The failure of the lessee under the lease agreement, however, to make a monthly payment of rent or to pay a third-party creditor has not been demonstrated in this record to constitute a default in Industrial Revenue Bonds issued under entirely separate contracts between the County Industrial Board and the project developer, appellees here. Conversely, default upon revenue bonds would not have terminated appellee's right to operate a nursing home in the renovated facility unless the future lease on that facility, contemplated by Article 9, should contain such a provision.

Whether appellees and the County Industrial Board will agree upon the terms of such bonds and carry out the construction of the new hospital is a question not involved in the present case. We simply hold, as did the courts below, that the right of the County to cancel the lease on the existing facilities did not carry with it any automatic right to terminate the development contract and the subsequent real estate option granted to appellees.

The parties could have drafted their contracts to effect such a result had that been their mutual intent. No reformation of those contracts has been sought or even suggested. The courts can only construe agreements as they are written. Those before us are not ambiguous. The two contracts were simply not made mutually dependent. It was entirely possible that the County might have to resume control and operation of the old hospital facility under the terms of the lease agreement. Not only was that contract terminable upon default; it expired at the end of thirty-six months. The Certificate of Need to authorize building of the new facility was not issued until eleven months of the lease had expired. Under the terms of the Certificate, appellees were not obligated to commence construction of the new facility until the twenty-ninth month of the lease would have expired. Whether the new building could be built and made operational within seven months is extremely problematical. At the expiration of the lease, a new agreement between the parties would have been necessary, or appellants could have then leased the old facility to others if they were dissatisfied with its operation by appellees. There was no right of renewal by the tenant, and the lease only suggested in broad outline the terms of a new and further lease that would have become necessary in connection with the renovation and subsequent operation of the old facility as a nursing home. The April 30, 1981 lease, at best, provided an interim arrangement for a maximum of three years. As drawn it did not govern the rights of the parties under the development contract, nor did the latter control their rights under the lease.

Although appellants argued in the trial court that the option granted in September 1981 to appellees was also integrated into the lease and development contract, that issue has not been seriously pursued on appeal. Indeed, the County Executive himself testified with respect to the option,

"That was not in the original agreement."

As stated previously, the option was obtained on some commercial property owned by the County after appellees had investigated several other potential sites. The option has been exercised by appellees. It is an asset owned by and is assignable by them. In our opinion the termination of the lease on the original facilities did not and could not affect the rights of appellees under the real estate option.

The judgment of the Court of Appeals is affirmed and the cause is remanded to the trial court for any further proceedings which may be necessary. Costs incident to the appeal to this Court are taxed to appellants. All other costs will remain as taxed by the courts below.

COOPER, C.J., and FONES, BROCK and DROWOTA, JJ., concur.